IN RE SAMANTHA C.*
(SC 16890)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Reporter of Judicial Decisions

Argued September 24, 2003—officially released April 27, 2004

*Brian Hole,* certified legal intern, with whom were *Paul Chill,* and, on the brief, *Julia Ulrich, Monique Rubb, Jennifer Milici, Anne Marshall* and *Kelly Flahive,* certified legal interns, for the appellants (respondents).

*Susan T. Pearlman,* assistant attorney general, with whom were *Nina F. Elgo,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, and *Joseph Rubin,* associate attorney general, for the appellee (petitioner).

*John J. Klikna* filed a brief for the minor child.

*Opinion*

BORDEN, J. The principal issue in this appeal is whether then existing Practice Book, 2001, § 34-1 (f)[1]

---

[1] Practice Book, 2001, § 34-1 (f), which was in effect at the time of the proceedings in the present case, provided: "Any child shall have the right to remain silent at any stage of the proceedings. No parent who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition."

Practice Book, 2001, § 34-1 (f) was repealed as of January 1, 2003.

allowed an adverse inference to be drawn against the respondents, without prior notice, for their failure to testify in a proceeding in which the petitioner sought to terminate their parental rights. The respondent parents, Jeffrey C. (father) and Shellie C. (mother), appeal from the judgment of the trial court, granting the petition of the commissioner of children and families (petitioner) to terminate their parental rights with respect to their minor daughter, Samantha C. They claim, among other things, that the trial court improperly drew an adverse inference against them, without prior notice, in violation of Practice Book, 2001, § 34-1 (f), for their failure to testify at the termination proceeding. We reverse the judgment of the trial court.

The petitioner filed this petition, pursuant to General Statutes § 17a-112,[2] seeking to terminate the respondents' parental rights with respect to Samantha. The respondents elected not to testify at the termination proceeding. The trial court found, by clear and convincing evidence, that the respondents had failed to achieve sufficient rehabilitation as required by § 17a-112 (j) (3) (B) (ii), and, accordingly, that court granted the petition. In doing so, however, the trial court expressly drew an adverse inference against the respondents for their failure to testify at the termination proceeding, stating that "the court infers from [the respondents'] silence that they are continuing their volatile relationship and are unable to care for Samantha's needs." This appeal followed.[3]

---

[2] General Statutes § 17a-112 (a) provides in relevant part: "In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child. . . ."

[3] The respondents appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c).

The record reveals the following relevant facts and procedural history. Samantha was born on April 24, 1996, and was the respondents' first child. The respondents were married on April 15, 1999, shortly before the birth of their second child, Lewis C., on June 4, 1999. Although Lewis has remained in the respondents' care throughout his life, Samantha has been in the care of the department of children and families (department) since December 20, 1997.

The respondents have been involved with each other since 1994, but they have separated several times over the years. Moreover, their relationship has been marked by frequent domestic disputes, to some of which the police have been called to respond. The department began assisting the respondents in early 1997, and assigned an in-home parent aide to help the couple with basic child care tasks and safety concerns.

Following a particular dispute to which the police were called,[4] the department investigated the respondents' home. On December 20, 1997, dissatisfied with Samantha's environment, particularly the uncleanliness of the home, the department exercised a ninety-six hour administrative hold over twenty month old Samantha. The department subsequently was granted an order of temporary custody over Samantha, allowing the respondents supervised visitation.

After two brief placements, Samantha was placed in the care of her maternal great aunt. The respondents rarely visited Samantha while she resided with her great

---

[4] This incident occurred in December, 1997, and involved the father "hijacking" the mother's truck while Samantha was in the backseat. As the mother was trying to get out of the car, the father began driving recklessly with the mother partially hanging out of the passenger side of the truck. As a result, the father was arrested and subsequently convicted of unlawful restraint.

aunt.[5] As a result, on April 9, 1999, the court adjudicated Samantha a neglected child. Thereafter, on January 24, 2000, Samantha was placed in another foster home, after the department had concluded that the great aunt's home was an inappropriate environment for Samantha.[6] It was later discovered that Samantha also had been sexually abused by another relative while she was residing with her great aunt.

Samantha's new foster parents tried to facilitate reunification and allowed the respondents to visit her. Nonetheless, the department noted that neither respondent had been following through with the department's referrals to service providers, the mother was not interacting with Samantha during visits, and the father, who remained unable to control his anger, seemed ambivalent about reunifying the family. For those reasons, in February, 2000, the petitioner filed the first of two petitions to terminate the respondents' parental rights with respect to Samantha.[7]

Thereafter, the respondents began to make progress toward reunification. The father maintained employment, attended anger management counseling and participated in a fatherhood initiative group. The respondents both made good progress in their individual counseling sessions. Additionally, the respondents

[5] A department caseworker testified that, between December, 1997, and April, 1999, the mother visited Samantha approximately ten times, while the father visited Samantha no more than five times.

[6] The department concluded that one of the great aunt's sons, a convicted felon, was residing at the aunt's home, as well as, from time to time, other inappropriate individuals. It also came to the department's attention that illegal drugs had been found at the home. Additionally, the department concluded that Samantha's great aunt had mental health problems, had kept the house in poor condition, and had not provided adequate care for Samantha. The father had expressed concerns about this environment as well.

[7] The second petition, which was filed in February, 2001, is the subject of this appeal.

engaged in couples therapy. Accordingly, on April 28, 2000, the petitioner withdrew that first termination petition.

In the fall of 2000, the department began to attempt to reunify the family. The respondents were now having overnight visits with Samantha at their home. During this time, however, the respondents were having marital problems. The department learned that the mother had taken Lewis and had left the father. Also around this time, Samantha's foster mother noticed a large bruise on the mother's neck. The foster mother also reported that Samantha had said her father was " 'bad,' " and that the mother had admitted that there were problems with the marriage. The mother had little contact with Samantha during this time, and she was uncertain whether she would seek a marital dissolution or continue with the reunification plan. The father expressed a desire to take Samantha on his own, but also made it clear that he would be unable to perform basic parenting functions, such as giving the child a bath. The department subsequently referred the respondents to couples counseling.

In December, 2000, the respondents resumed living together as a couple. A few weeks later, in January, 2001, after a long weekend, the respondents returned Samantha to her foster parents. She was filthy and had a bruise on her leg. Although the respondents maintained that the bruise had been caused when Samantha had been playing with a calf, the petitioner contended that the bruise was caused when the father had stepped on the child with his boots. The department investigated the respondents' home and found it unclean, noting that there were dog feces on the floor in an area where Lewis played. In February, 2001, the petitioner filed this second petition to terminate the respondents' parental rights with respect to Samantha.

During 2001, the respondents continued to visit Samantha, albeit in a supervised setting. The respondents' relationship, however, was not going well, and the mother reported that she had again separated from the father. Meanwhile, Samantha began to withdraw from her father and avoid interaction with him during his visits. The father admitted that his visits with Samantha were not going well. Additionally, Samantha's behavior had become worse. She began urinating and defecating in inappropriate places. As a result of her behavior, Samantha's foster mother requested that Samantha be placed elsewhere. On April 24, 2001, Samantha was placed in a preadoptive home, where she was residing at the time of the termination proceeding that is the subject of this appeal.

At the termination hearing, the petitioner presented the testimony of seven witnesses: one of Samantha's former foster mothers; a police officer; two department caseworkers; two therapists who treated Samantha; and a court-appointed psychologist, Robert Meier, who evaluated both Samantha and the respondents. The respondents presented no witnesses, and both elected not to testify at the proceeding.

In its memorandum of decision, the trial court first concluded that the petitioner had proven by clear and convincing evidence, as required by § 17a-112 (j) (1),[8]

[8] General Statutes § 17a-112 (j) provides: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior

that the department had made reasonable efforts to reunify Samantha with the respondents. The court next turned to the issue of whether the petitioner had proven that the respondents had failed to achieve sufficient personal rehabilitation,[9] as required by § 17a-112 (j) (3)

proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; (E) the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families; (F) the parent has killed through deliberate, nonaccidental act another child of the parent or has requested, commanded, importuned, attempted, conspired or solicited such killing or has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent; or (G) the parent was convicted as an adult or a delinquent by a court of competent jurisdiction of a sexual assault resulting in the conception of the child, except a conviction for a violation of section 53a-71 or 53a-73a, provided the court may terminate such parent's parental rights to such child at any time after such conviction."

[9] It should be noted that, with regard to the respondents' failure to achieve rehabilitation, the trial court was concerned that the respondents did not exhibit many of the problems usually shared by parents in termination of parental rights proceedings. Indeed, after the petitioner had presented all of the department's witnesses except Meier, the trial court opined: "I'll tell

(B) (ii).[10] On the basis of the testimony before it, and the thirty documents in evidence, the court noted that the petitioner had proven the following facts by clear and convincing evidence. "Prior to her recent preadoptive placement, Samantha had emotional and behavioral problems [including enuresis and encopresis].[11] Samantha's multiple placements and her sexual abuse in a relative['s] foster placement contributed to her emotional and behavioral problems. It was, however, her parents' issues that brought her into [the department's] care. During the first two years of Samantha's placement in foster care, her parents visited her little. From the end of 1999 to October, 2000, the respondents' relationship appeared to have stabilized. In fact, it had not. Samantha's emotional and behavioral problems subsided when [the department] abandoned reunification attempts and when Samantha was placed with her present, preadoptive parents. Thus, when Meier observed Samantha, her behavioral and emotional problems were in remission. These problems, however, would resurface and be aggravated if Samantha were returned to an environment marked by much yelling and instability.

you what's bothering me a little bit in the present case, because you shouldn't wonder what's on the trial judge's mind unnecessarily. It seems that—I mean there are a lot of cases in which domestic violence is an element of failure to rehabilitate. Here, it could be, somebody could say that you have a bad marriage, a troubled marriage, a lot of fighting going on, but not a lot else. You don't have the additional ingredients you often see with drugs and substance abuse, serious mental illness, bipolar disorder, something heavy like that. And so its—what troubles me is I wonder what percentage of families out there, nuclear families we're talking about, may have the same problems and is the state now getting into the business of terminating parental rights in connection with bad marriages." The court reiterated its concerns during Meier's testimony as well, remarking: "What percentage of families out there don't operate like this?"

[10] See footnote 8 of this opinion for the text of § 17a-112 (j) (3) (B) (ii).

[11] Enuresis is defined as: "Involuntary discharge or leakage of urine." T. Stedman, Medical Dictionary (27th Ed. 2000). Encopresis is defined as: "The repeated, generally involuntary passage of feces into inappropriate places (e.g., clothing)." Id.

Even assuming that the respondents could, individually, parent Samantha adequately, together they have chosen to maintain a relationship, and a lifestyle, that is chaotic, unstable and punctuated by domestic violence. Notably, Samantha has been in foster care for [more than four] years, far longer than is now prescribed by state [or federal] law . . . . Thus, the respondents have had more than enough time to rehabilitate. The court finds, as [Meier] opined, that all time for the respondents to rehabilitate has expired." (Citations omitted.)

The trial court also stated, "[t]he respondents, both of whom were present in the courtroom throughout the trial, elected not to testify. *The court infers from their silence that they are continuing their volatile relationship and are unable to care for Samantha's needs.*" (Emphasis added.) The court spent the next several pages[12] of its analysis discussing its reasons for drawing an adverse inference in this context. The court then stated: "Here, whether the respondents had eliminated the upheaval in their home caused by the father's behavior and the mother's periodically fleeing the home to parts unknown, such that either or both could care for Samantha, was a central issue in the adjudicatory portion of the case. [The department] presented evidence that the upheaval, indeed, was continuing. If the situation had changed, that evidence was uniquely within the power of the respondents to produce. With so much at stake, it was evidence that they naturally would have produced if they could have. They did not. Notably, the respondents were present in the courtroom throughout the trial. . . . *Weighing the evidence in light of the failure of the respondents to testify to the contrary,* the court finds by clear and convincing evidence that the respondents have failed to achieve such

---

[12] The trial court's memorandum of decision was forty-three double-spaced pages, thirteen of which were devoted to a discussion of the adverse inference.

degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Samantha's age and her needs, that they could assume a responsible position in her life." (Citation omitted; emphasis added.)

After making the required findings delineated in § 17a-112 (k),[13] the court concluded, by clear and convincing evidence, that it was in Samantha's best interest that the respondents' parental rights be terminated. Accordingly, the court granted the petition.

The respondents present four claims on appeal, any of which, if successful, would warrant reversal of the trial court's judgment. They claim that: (1) there was insufficient evidence for the trial court to have con-

---

[13] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

cluded that the respondents' had failed to achieve rehabilitation; (2) the trial court improperly concluded that the department had made reasonable efforts to reunify the family; (3) the trial court improperly drew an adverse inference against the respondents for their failure to testify at the termination proceeding in violation of Practice Book, 2001, § 34-1 (f); and (4) even if an adverse inference may permissibly have been drawn in the present case, the trial court was required to have given the respondents' prior notice of its intent to do so. We disagree with the respondents' first two claims. In addition, we conclude that, as a general matter, Practice Book, 2001, § 34-1 (f) did not prohibit the trial court from drawing an adverse inference against the respondents. We agree, however, with the respondents' fourth claim, namely, that the trial court was required to have given them prior notice of its intent to draw such an inference.

The respondents' first two claims are not dependent on their last two claims. If they were to prevail on either of their first two claims, they would be entitled to a reversal of the trial court's judgment and a judgment directed in their favor; whereas their last two claims would entitle them only to a reversal of the judgment and a new termination proceeding. Nevertheless, the respondents' first two claims are premised on the notion that the trial court made improper findings of fact. The trial court's factual findings, however, were based, at least in part, upon its drawing of an adverse inference. In this regard, we cannot say with any certainty whether the trial court would have ruled the way that it did in the absence of such an inference, nor can we conclude that it would have found the same facts by clear and convincing evidence. Thus, in order to reach properly the respondents' first two claims, we assume that the trial court would have made the same factual findings with or without the adverse inference. With those prin-

ciples in mind, we address each of the respondents' claims in seriatim.

## I

## FAILURE TO ACHIEVE REHABILITATION

The respondents first claim that there was insufficient evidence on which the trial court could have concluded that they had failed to achieve sufficient personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii).[14] We disagree.

We first turn to the standard of review that governs this claim.[15] A trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous. *In re Eden F.*, 250 Conn. 674, 705, 741 A.2d 873 (1999). A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 303–304, 823 A.2d 1184 (2003).

On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. Id., 303. In doing so, however, "[g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached

---

[14] See footnote 8 of this opinion for the text of § 17a-112 (j) (3) (B) (ii).

[15] The respondents, citing *Zachs* v. *Zoning Board of Appeals*, 218 Conn. 324, 331, 589 A.2d 351 (1991), contend that our review of this claim should be de novo. Although it is true that a "substantial evidence" test is often used when reviewing administrative appeals; see *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 541, 525 A.2d 940 (1987); findings in termination of parental rights cases are reviewed under the clearly erroneous standard. Merely phrasing a claim as resting on the sufficiency of the evidence, rather than on improper findings of fact, will not trigger a stricter standard of review than is warranted under our case law.

a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 705–706.

In order to terminate a parent's parental rights under § 17a-112,[16] the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3).

The sole ground alleged in this petition was that the respondents had failed to achieve rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii), which allows for termination if a child has been found to be neglected, *and* the parents have "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." "Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely *when she will be able to assume a responsible position in her child's life.* Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief

---

[16] See footnote 8 of this opinion for the text of § 17a-112 (j).

that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 706.

Our review of the record reveals that the evidence credited by the trial court adequately supported its conclusion that the respondents had failed to achieve sufficient rehabilitation. The petitioner presented seven witnesses to the trial court: one of Samantha's former foster mothers; a police officer; two department caseworkers; two therapists who had evaluated Samantha; and Meier, a court-appointed psychologist. The court reasonably concluded that Samantha had emotional and behavioral problems, which, according to Meier, were likely to resurface if she were to be placed in an unstable environment. The evidence suggested, moreover, that the respondents' relationship had remained unstable and chaotic, which created significant doubt as to whether they could adequately meet Samantha's needs. Indeed, Samantha's behavior tended to become worse after overnight visitations with the respondents. In particular, the court credited Meier's testimony, who concluded that, given the amount of time that Samantha had remained in temporary care, and given her need for permanency, the time for rehabilitation had passed. Thus, there was sufficient evidence for the trial court to have concluded that, considering the age and needs of the child, the respondents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that they could assume a responsible position in Samantha's life. Accordingly, the trial court's finding that the respondents had failed to achieve rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii) was not clearly erroneous.

The respondents argue, nonetheless, that their "ordinary marital problems" did not provide a sufficient basis on which to terminate their parental rights. We are not

persuaded. Irrespective of how the respondents' marital problems are characterized, the heart of the trial court's conclusion was based, not solely on the respondents marital problems, but on Samantha's special needs. It is well established that a parent's rehabilitative status must be viewed with respect to the needs of the particular child at issue. *In re Eden F.*, supra, 250 Conn. 706. Indeed, the evidence before the court suggested that Samantha, because of her unique behavioral problems, required care beyond that which the respondents were willing or able to provide. Thus, although the respondents' marital problems may arguably be characterized as "ordinary," at least in the sense that their problems may not have been as severe as marital problems in other termination cases, there was ample evidence for the court to find that they were unable to meet Samantha's needs.

In addition, the trial court correctly noted that it was irrelevant that the respondents' second child, Lewis, had not manifested the same behavioral problems as Samantha. Although the respondents may be able to care adequately for Lewis, who does not have the same needs as Samantha, there was enough evidence on which the trial court could have concluded that the respondents could not meet Samantha's needs.

The respondents further argue that trial court improperly relied on Samantha's past behavioral problems in terminating their parental rights because any behavioral problems of Samantha's were caused by the department and not by the respondents. In that regard, the respondents rely on *In re Valerie D.*, 223 Conn. 492, 534–35, 613 A.2d 748 (1992), arguing that it is a violation of due process to terminate one's parental rights based on conditions caused solely by the department. We are not persuaded. Although some of Samantha's problems may have manifested themselves after the department had taken custody of her, for instance, the sexual abuse

that had occurred during one of Samantha's foster placements, there was ample evidence on which the trial court could have concluded that Samantha's problems were caused and exacerbated by her exposure to the respondents' disputes. In addition, as noted by the trial court, Meier testified that it was the respondents' conduct that had placed Samantha in the department's care. Accordingly, we are not persuaded that the trial court terminated the respondents' parental rights based solely on conditions caused by the department.

Finally, the respondents argue that they were not given fair warning as to what conduct was required, or must have been avoided, in order to prevent termination of their parental rights. Specifically, the respondents contend that, because the department failed to discuss with them Samantha's special needs, termination was improper. This contention fails because there was evidence that the respondents were given ample notice regarding the problems with which the department was concerned. In one report, for instance, Meier laid out several steps the respondents must take in order to avoid the possibility that Samantha might be placed elsewhere. In addition, the respondents both engaged in couples therapy, and the father attended anger management counseling, as well as a fatherhood initiative group. Even if we were to assume that the respondents were not given *actual* notice of what conduct was required on their part, it is unreasonable to assume, based on their repeated interaction with the department, and the fact that Samantha had been in the department's care since late 1997, that they were unaware that certain conduct may have led to the filing of a termination petition.

II

REASONABLE EFFORTS TO REUNIFY FAMILY

We now turn to the respondents' second claim, namely, that the trial court improperly concluded that

the department had made reasonable efforts to reunify the family. We reject this claim.

In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it "has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . ." General Statutes § 17a-112 (j) (1). The standard for reviewing reasonable efforts has been well established by the Appellate Court. "Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, [§ 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *In re Daniel C.*, 63 Conn. App. 339, 361, 776 A.2d 487 (2001).

There was adequate evidence on which the trial court could have concluded that the department had made reasonable efforts to reunify the family. Since Samantha was placed in the department's custody beginning in late 1997, the department had offered to the respondents several programs to aid in their reunification. Indeed, as the trial court noted, these programs included: individual and family counseling; parenting

classes; psychological evaluations; an in-home parent aide; home visits with Samantha; supervised visitation; and case management services. In addition, the department scheduled two reunifications prior to the filing of the petition in the present case. Accordingly, the trial court's conclusion that the department made reasonable efforts to reunify the family was not clearly erroneous.

The respondents argue, nonetheless, that the trial court's observation that the second reunification was " 'prematurely aborted' " necessitates a finding that the department did not make reasonable efforts. We are not persuaded. The respondents give too much credit to this observation because, although the trial court did opine that the second reunification was "prematurely aborted," the court stated immediately thereafter that the services offered to the respondents were "well tailored" in the present case. In addition, Meier testified that, given the age and needs of Samantha, the time allotted for the respondents' rehabilitation had since passed. Considering the extended amount of time that Samantha had been in foster care, it was not unreasonable for the department to abandon reunification efforts when it did.

## III

## ADVERSE INFERENCE

The respondents next claim that the trial court improperly drew an adverse inference against them for their failure to testify at the termination proceeding in violation of Practice Book, 2001, § 34-1 (f). In support of their claim, the respondents first contend that the plain language of § 34-1 (f) dictated that no adverse inference could be drawn against a parent for his or her failure to testify. In addition, the respondents argue that, because the language in § 34-1 (f), providing that "[n]o parent . . . shall be compelled to testify if the

testimony might tend . . . to establish the validity of the facts alleged in the petition," mirrored that of the privilege against self-incrimination contained in the fifth amendment to the United States constitution, the two provisions ought to be interpreted the same way. Thus, the respondents contend, because the fifth amendment forbids an adverse inference from being drawn against a criminal defendant for electing not to testify at trial, § 34-1 (f) similarly forbade an adverse inference from being drawn against the respondents in the present case. The petitioner argues, to the contrary, that § 34-1 did not prohibit an adverse inference from being drawn against a parent; rather, the petitioner contends, it merely prohibited the petitioner from calling a parent to testify in a termination proceeding in an effort to prove the facts alleged in the petition. That is, the petitioner contends, although a parent has a right to refuse to testify in a termination proceeding, the petitioner may, as in any other civil proceeding, place a cost on a parent's assertion of that right, namely, allowing the trier of fact to draw an adverse inference. We agree with the petitioner.

A

We begin our analysis with a brief review of the law regarding adverse inferences drawn from a party's failure to testify in noncriminal proceedings. As a general rule, one party may call the other as a witness in any proceeding unless the latter is privileged not to testify. For instance, "[t]he fifth amendment privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." (Internal quotation marks omitted.) *Olin Corp.* v. *Castells*, 180 Conn. 49, 53, 428

A.2d 319 (1980). The privilege against self-incrimination also carries with it the added benefit that no adverse inference may be drawn against the accused in any criminal proceeding from the accused's invocation of the privilege. *Carter* v. *Kentucky*, 450 U.S. 288, 305, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981) (upon defendant's request, court must charge jury that no adverse inference may be drawn from defendant's failure to testify); *Griffin* v. *California*, 380 U.S. 609, 614–15, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (prosecutor may not comment on defendant's failure to testify); see also General Statutes § 54-84[17] (state constitution prohibition against unfavorable inference from accused's failure to testify). "The privilege does not, however, forbid the drawing of adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. The prevailing rule is that the fifth amendment does not preclude the inference where the privilege is claimed by a party to a civil cause." *Olin Corp.* v. *Castells*, supra, 53–54; see *Mitchell* v. *United States*, 526 U.S. 314, 328, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999).

In the absence of an express statutory provision to the contrary; see, e.g., General Statutes § 46b-138a[18] (no

---

[17] General Statutes § 54-84 provides: "(a) Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence."

[18] General Statutes § 46b-138a provides: "In any juvenile proceeding in the Superior Court, the accused child shall be a competent witness, and at his or her option may testify or refuse to testify in such proceedings. The parent or guardian of such child shall be a competent witness but may elect or refuse to testify for or against the accused child except that a parent or guardian who has received personal violence from the child may, upon the child's trial for offenses arising from such personal violence, be compelled

adverse inference may be drawn against accused juvenile for failure to testify in delinquency proceeding); General Statutes § 52-146k (f)[19] (no adverse inference may drawn if battered women's counselor fails to testify regarding privileged communications); "logic suggests that an adverse inference is warranted" when a witness invokes a nonconstitutional privilege. C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.5.2 (b), pp. 304–305.[20] "Thus, aside from the privilege against compelled self-incrimination . . . silence in the face of accusation is [in proper circumstances] a relevant fact not barred from evidence . . . ." *Baxter* v. *Palmigiano*, 425 U.S. 308, 319, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976). These remarks reflect the long-standing principle that the trier of fact "is entitled to draw all fair and reasonable inferences from the facts and circumstances [that] it finds established by the evidence," which consist both of what was said, and what naturally would have been. *State* v. *McDonough*, 129 Conn. 483, 486, 29 A.2d 582 (1942). This is perhaps best expressed in Justice Brandeis' pithy observation that "[s]ilence is often evidence

---

to testify in the same manner as any other witness. No unfavorable inferences shall be drawn by the court from the accused child's silence."

[19] General Statutes § 52-146k (f) provides: "The failure of any party to testify as a witness pursuant to the provisions of this section shall not result in an inference unfavorable to the state's cause or to the cause of the defendant."

[20] As to common-law privileges, Professor Colin Tait suggests that the only privilege that would justify a prohibition against an adverse inference for a witness' failure to testify is the attorney-client privilege. C. Tait, supra, § 5.5.2 (b), p. 305. In addition, our statutes provide for certain instances in which an adverse inference is expressly permitted. See, e.g., General Statutes § 14-227a (e) (inference permitted for refusal to submit to blood, breath or urine test in proceeding for operating motor vehicle under influence of intoxicating liquor or drugs); General Statutes § 15-140r (d) (inference permitted for refusal to submit to blood, breath or urine test in proceeding for operating boat under influence of intoxicating liquor or drugs); General Statutes § 46b-115cc (c) (adverse inference allowed if witness asserts privilege against self-incrimination in child custody enforcement proceeding); General Statutes § 46b-213a (g) (adverse inference allowed if witness asserts privilege against self-incrimination in support enforcement proceeding).

of the most persuasive character." *United States ex rel. Bilokumsky* v. *Tod*, 263 U.S. 149, 153–54, 44 S. Ct. 54, 68 L. Ed. 221 (1923), overruled in part, *Immigration & Naturalization Service* v. *Lopez-Mendoza*, 468 U.S. 1032, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984).

Furthermore, a trier of fact generally may draw an adverse inference against a party for its failure to rebut evidence. For years, Connecticut recognized the "missing witness" rule, which permitted a court to instruct the jury that it could draw an adverse inference against a party for its failure to call an available witness. See *State* v. *Malave*, 250 Conn. 722, 728–29, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). That instruction, known as a *Secondino* charge,[21] is now, for various policy reasons, prohibited by statute in civil cases; General Statutes § 52-216c;[22] and by our precedent in criminal cases. *State* v. *Malave*, supra, 739. Despite the statute and *Malave*, however, the substance of the "missing witness" rule remains intact because, even without an instruction from the court, the jury may nevertheless draw an adverse inference in the same instances. Provided that the witness is shown to be "available," § 52-216c expressly permits counsel to argue the point during closing arguments, and *Malave* allows "appropriate comment" regarding a witness' absence "[s]o long as counsel does not directly exhort the jury to draw an adverse inference . . . ." Id. Thus, although § 52-216c

---

[21] *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960), overruled in part, *State* v. *Malave*, supra, 250 Conn. 728–29.

[22] General Statutes § 52-216c provides: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments, except where prohibited by section 52-174, that the jury should draw an adverse inference from another party's failure to call a witness who has been proven to be available to testify."

and *Malave* restricted the means by which the trier of fact is apprised of its ability to draw an adverse inference, it is clear that it remains permitted to do so.

An adverse inference, however, does not supply *proof* of any particular fact; rather, it may be used only to *weigh* facts already in evidence. C. Tait, supra, § 4.3.2, p. 206; see *State* v. *McDonough,* supra, 129 Conn. 487; *Middletown Trust Co.* v. *Bregman,* 118 Conn. 651, 657, 174 A. 67 (1934). In that regard, an "inference drawn from the failure to testify . . . does not shift the burden of proof so as to relieve the party upon whom it rests of the necessity of establishing a prima facie case, although it may turn the scale when the evidence is closely balanced." (Internal quotation marks omitted.) *State* v. *McDonough,* supra, 487; *Middletown Trust Co.* v. *Bregman,* supra, 657.

In sum, a synthesis of the previous discussion reveals this general rule: After a prima facie case is established, an adverse inference may be drawn against a party for his or her failure to testify, unless the party was entitled to rely upon one of the few exceptional privileges that carry with it a protection from adverse inferences. With this background in mind, we turn to the merits of the respondents' claim.

### B

The privilege on which the respondents rely is that set forth in Practice Book, 2001, § 34-1 (f),[23] which was silent with regard to adverse inferences. The present case, therefore, requires us to interpret the scope and meaning of § 31-4 (f). Accordingly, this issue presents a question of law, over which our review is plenary. *Commissioner of Social Services* v. *Smith,* 265 Conn. 723, 734, 830 A.2d 228 (2003). We, therefore, examine

[23] See footnote 1 of this opinion for the text of Practice Book, 2001, § 34-1 (f).

the language of the rule, its relationship to the statutes that it was designed to implement, the official commentary to the rule, the policy behind the rule's adoption, and common-law and constitutional principles governing analogous situations.

In addition, we are mindful that, although "[t]he Superior Court is empowered to adopt and promulgate rules regulating pleading, practice and procedure . . . [s]uch rules shall not abridge, enlarge or modify any substantive right . . . ." (Internal quotation marks omitted.) *State* v. *King*, 187 Conn. 292, 297, 445 A.2d 901 (1982); see General Statutes § 51-14 (a). "Just as the general assembly lacks the power to enact rules governing procedure that is exclusively within the power of the courts; Conn. Const., art. V, § 1 . . . so do the courts lack the power to promulgate rules governing substantive rights and remedies." (Citation omitted; internal quotation marks omitted.) *Pesino* v. *Atlantic Bank of New York*, 244 Conn. 85, 85–86 n.1, 709 A.2d 540 (1998). Finally, "the court rules themselves are expressly limited in scope to practice and procedure in the Superior Court; Practice Book § [1-1]; and do not purport to reach beyond such limits." (Internal quotation marks omitted.) *State* v. *King*, supra, 297. Accordingly, although the branches of government "frequently overlap," and notwithstanding that "the doctrine of the separation of powers cannot be applied rigidly"; *Bartholomew* v. *Schweizer*, 217 Conn. 671, 676, 587 A.2d 1014 (1991); we are obliged to interpret Practice Book, 2001, § 34-1 so as not to *create* a new right, but rather to *delineate* whatever rights may have existed, statutorily or otherwise, at the time of the proceedings underlying the present appeal.[24]

---

[24] This is consistent with the language used in *Mitchell* v. *Mitchell*, 194 Conn. 312, 324, 481 A.2d 31 (1984), wherein this court stated: "Certainly, where a statute creates a substantive right, a *conflicting* practice book rule cannot stand." (Emphasis added.) Neither party asserts that Practice Book, 2001, § 34-1 (f) conflicts with any statute, nor does either party attack its validity. Thus, we assume that § 34-1 (f) is valid, and construe it to the extent

We conclude that Practice Book, 2001, § 34-1 (f) did not preclude the trial court from drawing an adverse inference from the respondents' failure to testify. We base this conclusion on: (1) the language of § 34-1 (f); (2) the official commentary to the rule of practice that succeeded § 34-1 (f); and (3) the policies of the statutes that § 34-1 (f) was adopted to implement. More specifically, we conclude that § 34-1 (f) must be read in light of the statutes that it implemented, and that the policy of those statutes requires an interpretation of § 34-1 (f) that runs contrary to the respondents' contentions.

C

We next turn to a brief review of the relevant statutes and rules, many of which overlap, that govern termination of parental rights proceedings. For children already in the custody of the department, like Samantha in the present case, termination of parental rights petitions are filed in the Superior Court for Juvenile Matters pursuant to § 17a-112. Other such petitions may be filed in the Probate Courts pursuant to General Statutes § 45a-715. In either case, hearing procedures are governed by General Statutes §§ 45a-716 and 45a-717. P. Chill, The Law of Child Abuse and Neglect in Connecticut (University of Connecticut Legal Clinic 1997) pp. 121, 133.

In addition, juvenile matters are governed by General Statutes § 46b-120 et seq. These statutes provide parties to juvenile proceedings with, among other things, certain rights, such as the right to counsel and the "right to refuse to make any statement . . . ." General Statutes § 46b-137 (b); see, e.g., General Statutes § 46b-135 (right to counsel and cross-examination); General Statutes § 46b-136 (appointed counsel at judge's discretion); General Statutes § 46b-137 (admissibility of con-

that it implements legislation in effect during the proceedings underlying the present appeal.

fessions); General Statutes § 46b-138a (testimony of accused juvenile and parent in delinquency proceeding). Juvenile matters in the "civil session" include proceedings concerning neglected, uncared-for or dependent children, as well as "termination of parental rights of children committed to a state agency," whereas juvenile matters in the "criminal session" include all delinquency proceedings. General Statutes § 46b-121 (a).[25]

Finally, at the time of the proceedings underlying this appeal, chapter 34 of the Practice Book, most of which has been transferred to chapter 32a, outlined the rights of parties in juvenile matters. We turn first, therefore, to the language of Practice Book, 2001, § 34-1 (a),[26]

[25] General Statutes § 46b-121 (a) provides: "Juvenile matters in the civil session include all proceedings concerning uncared-for, neglected or dependent children and youth within this state, termination of parental rights of children committed to a state agency, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from the Probate Court, the emancipation of minors and youth in crisis, but does not include matters of guardianship and adoption or matters affecting property rights of any child, youth or youth in crisis over which the Probate Court has jurisdiction, provided appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included. Juvenile matters in the criminal session include all proceedings concerning delinquent children in the state and persons sixteen years of age and older who are under the supervision of a juvenile probation officer while on probation or a suspended commitment to the Department of Children and Families, for purposes of enforcing any court orders entered as part of such probation or suspended commitment."

[26] Practice Book, 2001, § 34-1 provided: "(a) The judicial authority shall advise and explain to the parents, child or youth their right to silence and to counsel prior to commencement of any proceeding.

"(b) Said parties have the rights of confrontation and cross-examination and may be represented by counsel in each and every phase of any and all proceedings in juvenile matters, including appeals, and if they are unable to afford counsel, counsel will be appointed to represent them if such is their request. The judicial authority shall appoint counsel for these parties or any of them (1) upon request and upon a finding that the party is, in fact, financially unable to employ counsel, or (2) in the case of counsel for the child, whether a request is made or not, in any proceeding on a juvenile matter in which the custody of a child is at issue, or if in the opinion of

which, like its statutory counterparts, provided parents in juvenile matters with a "right to silence and to counsel" in hearings concerning neglected, uncared-for or dependent children, termination of parental rights proceedings, as well as delinquency proceedings.

The present case turns on a careful reading of Practice Book, 2001, § 34-1, specifically subsections (a) and (f), which grant and clarify, respectively, the "right to silence" on which the respondents rely. Subsection (a) provides: "The judicial authority shall advise and explain to the parents, child or youth their *right to silence* and to counsel prior to commencement of any proceeding."[27] (Emphasis added.) Practice Book, 2001, § 34-1 (a). Subsection (f) delineates the parent's or child's "right to silence" referred to in subsection (a), by providing that "[a]ny child shall have the right to

the judicial authority the interests of the child and the parents conflict, or (3) in the case of counsel for the child and the parent, whether a request is made or not, if in the opinion of the judicial authority a fair hearing necessitates such an appointment.

"(c) The judicial authority may appoint counsel for an unidentified parent or an absent parent who has received only constructive notice of termination proceedings, for the limited purposes of conducting a reasonable search for the unidentified or absent parent and reporting to the judicial authority before any adjudication. The petitioner shall be represented by counsel in contested matters.

"(d) Where the judicial authority so appoints counsel for any such party who is found able to pay, in whole or in part, the cost thereof, it shall assess as costs against such parent or custodian, including any agency vested with the legal custody of the child, the expense so incurred and paid for by the court in providing such counsel, to the extent of their financial ability to do so.

"(e) Either the petitions or the notices of initial hearings on petitions, including revocation or motions to modify dispositions shall contain a statement of the respondent's right to counsel.

"(f) Any child shall have the right to remain silent at any stage of the proceedings. No parent who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition."

[27] Subsections (b), (c), (d) and (e) of Practice Book, 2001, § 34-1 delineate the parent's or child's right to counsel referred to in subsection (a). See footnote 26 of this opinion for the text Practice Book, 2001, § 34-1.

remain silent at any stage of the proceedings. No parent who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition." Practice Book, 2001, § 34-1 (f). Thus, as the petitioner concedes, § 34-1 (f) prohibited the petitioner from calling a parent to testify in a termination proceeding in an effort to prove the facts alleged in the petition.

With respect to the drawing of an adverse inference, however, the language of Practice Book, 2001, § 34-1 (f) may plausibly be read either in favor of the petitioner or the respondents. Thus, one could infer that the prohibition of subsection (f) against "compell[ing] [a parent] to testify . . . to establish the validity of the facts alleged in the petition," did not prohibit an adverse inference from the parents' failure voluntarily to testify, because it suggested only a prohibition against the petitioner calling a parent to the stand, or arguably taking his or her deposition, in order to establish such facts. One could also infer, to the contrary, that the language was intended to prohibit, not only direct compulsion such as that described, but what may be regarded as its functional equivalent, by virtue of the court drawing an adverse inference from the failure to testify voluntarily. Although the balance is fairly close, we think the more plausible interpretation is the former. This initial conclusion is buttressed by reference to the extratextual sources of the meaning of the language of § 34-1 (f). We turn, next, to those sources.

### D

With regard to a parent's right to silence, Practice Book § 34-1 was adopted in order to implement § 46b-137,[28] which governs the admissibility of confessions

---

[28] General Statutes § 46b-137 provides: "(a) Any admission, confession or statement, written or oral, made by a child to a police officer or Juvenile Court official shall be inadmissible in any proceeding concerning the alleged delinquency of the child making such admission, confession or statement

and other statements in juvenile proceedings. Section 46b-137, which was initially enacted in 1967; Public Acts 1967, No. 630, §§ 7, 10; and later amended in 1969; Public Acts, 1969, No. 794, §§ 13, 14; by its language and purpose was enacted to afford certain constitutional rights to parents and children in juvenile matters. The earliest version of Practice Book § 34-1 (f) was adopted five years later in 1974.[29]

Section 46b-137 (a) relates to delinquency proceedings, and spells out, among other things, an accused child's right to silence. Subsection (b) of § 46b-137 relates to proceedings in which a petition alleges neglect, and similarly provides parents with a right to silence. Specifically, § 46b-137 (b) provides, among other things, that any statement made by a parent, after the filing of a petition, shall be inadmissible against the

unless made by such child in the presence of his parent or parents or guardian and after the parent or parents or guardian and child have been advised (1) of the child's right to retain counsel, or if unable to afford counsel, to have counsel appointed on the child's behalf, (2) of the child's right to refuse to make any statements and (3) that any statements he makes may be introduced into evidence against him.

"(b) Any confession, admission or statement, written or oral, made by the parent or parents or guardian of the child or youth after the filing of a petition alleging such child or youth to be neglected, uncared-for or dependent, shall be inadmissible in any proceeding held upon such petition against the person making such admission or statement unless such person shall have been advised of his right to retain counsel, and that if he is unable to afford counsel, counsel will be appointed to represent him, that he has a right to refuse to make any statement and that any statements he makes may be introduced in evidence against him."

[29] The first mention in our rules of practice of a parent's right to silence in juvenile matters can be traced to § 1123 (2) of the 1974 cumulative supplement to the 1963 revision of the Practice Book. Practice Book (Cum. Sup. 1974) § 1123 (2), which was effective July 1, 1974, provided: "No parent who is the subject of a neglect proceeding or a hearing to terminate parental rights shall be compelled to testify if the testimony might tend to incriminate him in any criminal proceeding or to establish jurisdiction over him in the juvenile court proceeding in question." That language remained unchanged until 1993, when Practice Book, 1993, § 1048.1, which was effective October 1, 1993, was adopted, and used the same language as that contained in § 34-1 (f).

parent unless he or she had been advised of his or her right to counsel and "right to refuse to make any statement . . . ."

Practice Book § 34-1 bestowed upon parents rights matching those outlined in § 46b-137 (b), although the rule defined those rights more precisely than does the statute. For instance, both the rule and statute specifically address a parent's right to counsel and right to silence in neglect proceedings. With respect to a parent's right to counsel, both the rule and the statute provide that parents must be advised of their right to counsel, and that, in the event that a parent is unable to afford counsel, counsel will be appointed, although the rule also defined by whom, in what manner, and in what situations counsel will be appointed. Practice Book, 2001, § 34-1 (b) through (e).[30] With respect to a parent's right to silence, § 46b-137 (b) provides that a parent must be advised of his or her "right to refuse to make any statement," while Practice Book, 2001, § 34-1 (a) provided that a parent must be advised of his or her "right to remain silent," *and* that "[n]o parent . . . shall be compelled to testify . . . ." Practice Book, 2001, § 34-1 (f). These similarities provide ample support that Practice Book § 34-1 was drafted with § 46b-137 (b) in mind.

Further, bolstering this conclusion is the official commentary to Practice Book, 2001, § 34-1 (f) contained in the 2003 Practice Book, explaining that § 34-1 (f) was repealed and was replaced by Practice Book § 32a-1 (e),[31] which was effective January

---

[30] See footnote 26 of this opinion for the text of Practice Book, 2001, § 34-1.

[31] Practice Book § 32a-1 (e), which was adopted June 24, 2002, to take effect January 1, 2003, provides: "Any confession, admission or statement, written or oral, made by the parent or parents or guardian of the child or youth after the filing of a petition alleging such child or youth to be neglected, uncared-for or dependent, shall be inadmissible in any proceeding held upon such petition against the person making such admission or statement unless such person shall have been advised of his right to retain counsel, and that if he is unable to afford counsel, counsel will be appointed to represent

1, 2003.[32] According to the official commentary, Practice Book § 32a-1 (e) is taken verbatim from § 46b-137 (b).

The official commentary to Practice Book § 32a-1 (e) states that "[§ 34-1 (f)] inappropriately narrow[ed] the right as set forth in [§ 46b-137 (b)]." Although the commentary did not define precisely how the rule "inappropriately narrow[ed]" the statute, one commentator has suggested that § 46b-137 (b) allows for broader rights than does Practice Book, 2001, § 34-1 (f) because, whereas § 46b-137 (b) provides the "right to refuse to make any statement," the rule "suggests that a parent may be compelled to testify in other respects—such as with regard to deposition." P. Chill, supra, p. 81. In that regard, "the . . . rule here probably must yield to the statute." Id.; C. Tait, supra, § 1.15.2 (b), p. 49 ("[a]lthough [§ 34-1 (f)] might be viewed as limiting a parent's right not to testify in such proceedings, the rule is subsumed in [§ 46b-137 (b)] that provides parents with a broad right not to make any statement" [internal quotation marks omitted]). Although these remarks make no mention of whether an adverse inference is permissible under either the rule or the statute, they support our conclusion that Practice Book § 34-1 (f) was adopted with § 46b-137 (b) in mind. Considering the similarities between Practice Book § 34-1 and § 46b-137 (b), both its official and unofficial commentaries, and that it is the explicit predecessor to Practice Book

him, that he has a right to refuse to make any statement and that any statements he makes may be introduced in evidence against him."

[32] The official commentary to Practice Book, 2001, § 34-1 (f) in the 2003 Practice Book states that "[s]ubsection (f) is no longer necessary as it inappropriately narrows the right to remain silent in neglect matters and is replaced by [Practice Book §] 32a-1 (e)." We note that the underlying proceedings in this case took place before the effective date of Practice Book § 32a-1. Thus, Practice Book, 2001, § 34-1 was, and is, controlling in the present case. We refer to the current revision of the Practice Book only to the extent that it supports our conclusion that Practice Book § 34-1 ought to be interpreted with § 46b-137 (b) in mind.

§ 32a-1, we conclude that Practice Book § 34-1 was drafted in order to implement § 46b-137 (b). Accordingly, it is appropriate to interpret Practice Book § 34-1 (f) in accord with § 46b-137 (b) and the legislative policies that both the rule and the statute were designed to serve.[33]

The legislative history to § 46b-137 (b) undermines the respondents' contention that Practice Book § 34-1 (f) prohibits the drawing of an adverse inference against a parent for his or her failure to testify in a termination proceeding. Subsection (b) of § 46b-137 was enacted in 1969 by § 14 of No. 794 of the 1969 Public Acts, entitled "An Act Concerning the Juvenile Court." The proposed bill had been described as a "potpourri"; 13 H.R. Proc., Pt. 11, 1969 Sess., p. 4980, remarks of Representative James T. Healey; because it embodied several changes in our juvenile law, "especially with the recognition of [*In re Gault*, 387 U.S. 1, 41, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967) (statements inadmissible in delinquency proceedings unless accused child is advised of right to silence and counsel), and *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (requiring law enforcement personnel to advise suspects in police custody of their rights to counsel and silence)] . . . ." 13 H.R. Proc., supra, p. 4986, remarks of Representative James F. Bingham. Referring to § 9 of Substitute House Bill No. 6665, which is now codified at General Statutes § 46b-134, Representative Healey stated that the bill was necessary in light of *In re Gault*, which required that juvenile court proceedings for delinquency matters be treated as "quasi-criminal . . . ." 13 H.R. Proc., supra, p. 4983. Representative

---

[33] Although the respondents acknowledge that § 46b-137 (b) is aimed, in part, at advising a parent of his or her "right to refuse to make any statement," they contend that § 46b-137 "provides absolutely no useful guidance in interpreting the rule." On the basis of the foregoing analysis, and our forthcoming review of its legislative history, we conclude that § 46b-137 (b) should inform our interpretation of Practice Book § 34-1.

Healey further noted that § 12 of the bill, which is now codified at General Statutes § 46b-135, "spells out that, *in neglect-uncared for dependent child situation as opposed to delinquency*," a parent must be advised of his or her right to counsel, "but it is not mandatory that the child itself be informed *insofar as these are not quasi-criminal proceedings*." (Emphasis added.) Id., p. 4984. Next, referring to §§ 13 and 14 of the bill, which are now codified at subsections (a) and (b) of § 46b-137, respectively, Representative Healey stated, "[§ 46b-137 (a)] spells out that a confession is [i]nadmissible *in delinquency proceedings* unless it is clearly established that the confession has been obtained after a warning as to the rights. This differs from the following section, *[§ 46b-137 (b)], which has to do with neglect-uncared for type of proceedings, a truly administrative one rather than a quasi-criminal, in that a confession will not be admissible if made after the petition has been filed, unless the parent or the child or guardian [has] been advised of rights. . . . This is appropriate insofar as we are dealing essentially with a civil action, civil type proceedings,* and admission against interest is normally available in civil proceedings." (Emphasis added.) Id. In addition, Representative James J. Kennelly supported the bill because "*children . . . are entitled to . . . expect all constitutional safeguards*" as would be afforded any other citizen. (Emphasis added.) Id., p. 4985.

Although no mention of an adverse inference was made, these remarks weaken the respondents' claim. The remarks evince a legislative intent to provide constitutional safeguards to *children in delinquency proceedings,* not to parents in neglect and uncared-for proceedings. The proponents of the bill made it a point explicitly to label delinquency proceedings, but *not* neglect and uncared-for proceedings, as "quasi-criminal." Id., p. 4984, remarks of Representative Healey.

When describing neglect and uncared-for proceedings, however, such as the underlying proceedings in the present case, the proponents of the bill referred to them as "truly administrative . . . rather than quasi-criminal," and characterized them as essentially "civil type proceedings . . . ." Id. These comments run contrary to the respondents' assertion that we ought to resist "the civil label of convenience" in the present case. Indeed, these comments invite us to do so.

The remarks indicate, moreover, that the central policy goal behind § 46b-137 (b) was to prohibit the admission of testimonial evidence unless the parent had been advised of certain rights; thus, it applied *Miranda*'s exclusionary rule to neglect and uncared-for proceedings. C. Tait, supra, § 1.15.2 (d), pp. 49–50. The legislature's use of *Miranda*-type warnings in § 46b-137 (b) sought to prevent the petitioner from obtaining, and admitting into evidence, a parent's unwarned statement made after the filing of a petition. The legislature did not, however, intend to equate a parent's rights with those of a child in a delinquency proceeding or those of a criminal defendant in a criminal proceeding. A fair reading of the legislative history of § 46b-137, therefore, leads us to conclude that the legislature in 1969 sought to extend constitutional safeguards to children in delinquency proceedings, but not to parents in neglect and uncared-for proceedings. Those proceedings, like the proceedings in this case, are not quasi-criminal, and, therefore, do not warrant the same constitutional protections as do delinquency proceedings.

Five years after the enactment of § 46b-137, Practice Book § 34-1 was adopted to allow courts to implement the various statutes relating to juvenile matters, many of which were enacted along with § 46b-137.[34] Practice Book § 34-1 applied to all "juvenile matters," which

---

[34] See footnote 28 of this opinion for the text of § 46b-137.

included neglect, termination *and* delinquency proceedings. What is confusing here is that Practice Book § 34-1 discussed a *child's* right to silence in delinquency matters, which was derived from § 46b-137 (a), contemporaneously with a *parent's* right to silence in neglect or termination proceedings, which was derived from § 46b-137 (b), although the two rights are distinct and do not apply uniformly to every situation. For example, Practice Book § 34-1 (a) provides parents and children with a right to silence in *any* proceeding. Children, however, do not have the right to silence in neglect proceedings; they have that right only in delinquency proceedings.[35] This is highlighted by the eventual replacement of Practice Book, 2001, § 34-1 (a) with Practice Book § 32a-1 (a), which now provides only parents with a right to silence; delinquency proceedings are not covered by § 32a-1, but are described elsewhere in the Practice Book. See Practice Book chs. 27, 29, 30, 30a and 31a. This is relevant because Practice Book § 34-1 confusingly commingled the rights set forth in subsections (a) and (b) of § 46b-137, when it arguably should have addressed each subsection separately, because, as previously discussed, a parent's right to silence in neglect proceedings is not equivalent to an accused child's right to silence in delinquency proceedings.

In 1979, § 46b-138a[36] was enacted, and further highlighted the difference between children in delinquency proceedings and parents in termination proceedings. See Public Acts 1979, No. 263. It explicitly provides that an accused child, as well as his parent or guardian, may refuse to testify in a delinquency proceeding, *and* that

[35] The official commentary to Practice Book § 32a-1, which cites *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), and General Statutes § 46b-135, explicitly states that the prior rule incorrectly indicated that children could remain silent in neglect and uncared-for proceedings.

[36] See footnote 18 of this opinion for the text of § 46b-138a.

no adverse inference may be drawn against the *accused child.* Id. No corresponding statutory provision was created for parents in neglect proceedings as was done in § 46b-137. Professor Tait has noted, therefore, that this omission suggests that an inference may be drawn from a parent's silence in delinquency proceedings. C. Tait, supra, § 5.5.2 (b), p. 304. This is another illustration of the legislature's intention to single out delinquency proceedings, but not termination proceedings, as quasi-criminal, because the accused child is akin to a criminal defendant.

In that regard, allegations in delinquency proceedings, like allegations in criminal proceedings, must be proven beyond a reasonable doubt. Id., § 1.15.3 (a), p. 52; id., § 1.15.4 (c), pp. 54–55. Delinquency proceedings, moreover, resemble criminal trials in many ways, even directing the accused to file motions to dismiss and suppress under the rules of criminal procedure. See Practice Book §§ 31a-3, 31a-4. Given these similarities, it makes sense to provide children in delinquency proceedings with full constitutional safeguards usually available only to criminal defendants, including the right to be free from adverse inferences. Compare General Statutes § 46b-138a (prohibiting adverse inferences against accused child in delinquency proceedings) with General Statutes § 54-84 (prohibiting adverse inference against criminal defendant in criminal proceeding).

Termination of parental rights proceedings, however, are remedial and "essentially civil" in nature; Practice Book § 32a-2 (a); and ought to be resolved with the "best interests of [the] child" in mind. General Statutes §§ 17a-112 (p), 45a-706 and 46b-121; see *In re Baby Girl B.*, 224 Conn. 263, 282, 618 A.2d 1 (1992). The legislature, therefore, has chosen not to provide parents with the full gamut of rights afforded to accused children in "quasi-criminal" proceedings. On the basis of the foregoing, we conclude that the legislature did not intend

to insulate parents from adverse inferences drawn from their failure to testify at termination proceedings. Accordingly, because Practice Book § 34-1 (f) was designed to implement its statutory counterparts,[37] we conclude that it did not prohibit an adverse inference from being drawn against the respondents in the present case.

E

The respondents argue, nevertheless, that § 46b-137 (b) should not be used in interpreting the meaning of Practice Book § 34-1 (f). Although the respondents acknowledge that § 46b-137 (b) is aimed, in part, at advising a parent of his or her "right to refuse to make any statement," they argue that § 46b-137 "provides absolutely no useful guidance in interpreting the rule." Relying on the official commentary to Practice Book § 32a-1, which states, among other things, that "[a]lthough no statute explicitly provides parents in termination of parental rights cases with the right to remain silent," the respondents argue "that the rule and statute provide *independent* sources of parents' right to silence." (Emphasis added.) The respondents point out, moreover, that "[p]resumably the rules committee [in adopting Practice Book § 34-1 (f)] believed that . . . § 46b-137 (b) itself does not create a right to silence *in termination cases* because the statute applies *only* in any proceeding held upon a neglect, uncared-for or dependency petition." (Emphasis added; internal quotation marks omitted.) Thus, the respondents contend, Practice Book § 34-1 (f) was meant to *extend* the statute

---

[37] We do not mean to intimate, however, that the judges of the Superior Court could not, in their procedural rule-making authority, adopt a rule prohibiting adverse inferences, in the absence of a statutory directive; rather, our conclusion merely reflects the notion that, because the legislature already had defined a parent's "right to silence" via § 46b-137 (b), Practice Book § 34-1 (f) was adopted in order for courts to implement, *as a matter of procedure*, that right.

to apply beyond neglect, uncared-for or dependency proceedings, and to termination of parental rights proceedings as well.[38] We disagree.

It is clear that § 46b-137 (b) applies to termination of parental rights proceedings when the petition alleges, as it does in the present case, that the child has been neglected or uncared-for. First, the language of § 46b-137 (b) indicates that statements made "after the filing of a petition alleging such child or youth to be neglected, uncared-for or dependent, shall be inadmissible in *any proceeding held upon such petition* . . . ." (Emphasis added.) Section 17a-112 (j) sets forth the various bases for nonconsensual terminations of parental rights, one of which requires, among other things, that the child has been found to be "neglected or uncared for . . . ." General Statutes § 17a-112 (j) (3) (B) (i). Thus, the petition in this case, which alleged that Samantha had been found in a prior proceeding to be neglected or uncared-for pursuant to § 17a-112 (j) (3) (B) (i),[39] falls within the language of § 46b-137 (b).

Second, in defining "[j]uvenile matters," § 46b-121 (a),[40] which defines the scope of § 46b-137 (b), provides

[38] The respondents argue that such rule making was proper because Practice Book § 34-1 (f) was a rule of evidence, and merely created a testimonial privilege rather than a substantive right. Because neither party attacks the validity of Practice Book § 34-1 (f), however, and because we conclude that § 46b-137 (b) applies to this termination petition, we need not consider whether the rule properly created a rule of evidence or improperly created a substantive right.

[39] The petition underlying the present case sought termination under § 17a-112 (j) (3) (B) (i), which provides, among other things, that termination is appropriate when the child "has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . ." The trial court granted the petition, however, pursuant to § 17a-112 (j) (3) (B) (ii), which provides, among other things, that termination is appropriate when the child "is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months . . . ." In either case, § 46b-137 is applicable.

[40] See footnote 25 of this opinion for the text of § 46b-121.

that "[j]uvenile matters in the civil session include all proceedings concerning . . . termination of parental rights of children committed to a state agency . . . ." Thus, § 46b-137 (b) applies to the proceedings in the present case because Samantha was committed to the care of the department when the petition was filed.

In addition, § 17a-112 (*l*)[41] and Practice Book § 35a-3[42] allow for the filing of a coterminous petition, whereby a petition to terminate parental rights may be accompanied by, or consolidated with, a petition to adjudicate a child neglected, uncared-for or dependent filed under General Statutes § 46b-129. Allowing the petitioner to accompany or consolidate the termination petition with a neglect petition contemplates that the same rules governing the admissibility of testimonial evidence naturally would apply to both proceedings. One commentator has stated, in that regard, that "[t]he rules of evidence as applied in termination cases are generally identical to those in neglect cases." P. Chill, supra, p.

[41] General Statutes § 17a-112 (*l*) provides: "Any petition brought by the Commissioner of Children and Families to the Superior Court, pursuant to subsection (a) of section 46b-129, may be accompanied by or, upon motion by the petitioner, consolidated with a petition for termination of parental rights filed in accordance with this section with respect to such child. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The Superior Court, after hearing, in accordance with the provisions of subsection (i) or (j) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717."

[42] Practice Book § 35a-3 provides: "When coterminous petitions are filed, the judicial authority first determines by a fair preponderance of the evidence whether the child is neglected, uncared for or dependent; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence. If the judicial authority determines that termination grounds do not exist or termination is not in the best interest of the child, then the judicial authority may consider by a fair preponderance of the evidence any of the dispositional alternatives available under the neglect, uncared for or dependent petition."

142. These evidentiary similarities provide further support to the conclusion that § 46b-137 (b) applies to termination proceedings.

Finally, it is appropriate to read the statute broadly, given that termination proceedings are at least as deserving to receive additional evidentiary safeguards as are neglect, uncared-for or dependency proceedings. Considering that the respondents have failed to cite any authority that states that a parent in a termination proceeding may remain silent under the rule, but not under the statute, we see no reason why § 46b-137 (b) should not inform our interpretation of Practice Book § 34-1 (f).

The respondents also argue that the trial court's reliance on the "missing witness" rule was improper because the parents in this case were not "available" to testify as required by § 52-216c and *State* v. *Malave*, supra, 250 Conn. 739. This argument is without merit.

Although it is true that a witness who is likely to assert a testimonial privilege, such as the fifth amendment's privilege against self-incrimination, is technically "unavailable" to testify in a strict evidentiary sense; see, e.g., *State* v. *Young*, 258 Conn. 79, 91–94, 779 A.2d 112 (2001) (missing witness instruction not permissible because witness likely would have invoked privilege against self-incrimination); Fed. R. Evid. 804 (a) (1); that reasoning does not apply when the "missing witness" is also a party to the case. The liberal definition of the word "unavailable" that is employed with regard to the "missing witness" rule stems from the commonsense notion that, when a party is unable to call a witness through no fault of his own, an adverse inference is not warranted. That is exactly the reason why § 52-216c requires counsel in civil cases to make a threshold showing of unavailability before that point may be argued to the jury; *Raybeck* v. *Danbury Orthopedic*

*Associates, P.C.,* 72 Conn. App. 359, 370, 805 A.2d 130 (2002); and why *Malave* requires counsel in criminal cases to notify the court and opposing counsel in advance of closing arguments of the intention to comment on a witness' absence. *State* v. *Malave,* supra, 250 Conn. 740. Such a notice requirement allows the party against whom the inference is sought to prepare for and to rebut opposing counsel's comments, while also ensuring that the inference is warranted because the missing witness is, in fact, unavailable. When the party against whom the inference is drawn, however, is also the "missing witness," those concerns evaporate because the witness' availability is dependent on his or her choice not to testify. That is the situation in the present case; the respondents could have testified, but they chose not to. Their availability was dependent on their decision not to testify, rather than on the decision of a third party witness over whom they had no control.

The present case, moreover, involves neither an instruction nor comments to a jury; rather, it involves a trier of fact drawing the inference on its own accord. Thus, because there is no issue regarding the unavailability of the respondents, and there is no claim that counsel commented inappropriately, any limitations or concerns related to the *Secondino* rule are not implicated in this issue.

We realize, of course, that the "missing witness" rule provides a less than perfect analogue for the present case because it was intended to address the drawing of an adverse inference against a party for its failure to call an available witness, rather than for a party's assertion of a privilege not to testify. The rule, nonetheless, is persuasive inasmuch as it reveals a legislative and judicial intent to adhere to the commonsense approach that a party's failure to rebut evidence that the party naturally would be able to refute, through testimony or physical evidence, may warrant an infer-

ence that such evidence either does not exist or would be unfavorable.

F

The remainder of the respondents' arguments are premised on the notion that our interpretation of Practice Book § 34-1 (f) should be guided by United States Supreme Court precedent interpreting the fifth amendment. Specifically, they contend that, because the language in Practice Book, 2001, § 34-1 (f), providing that "[n]o parent . . . shall be compelled to testify if the testimony might tend . . . to establish the validity of the facts alleged in the petition," mirrored that of the privilege against self-incrimination contained in the fifth amendment to the United States constitution, the two provisions ought to be interpreted the same way. Thus, the respondents contend, because the fifth amendment forbids an adverse inference to be drawn against a criminal defendant for electing not to testify at trial, § 34-1 (f) similarly forbade an adverse inference to be drawn against the respondents in the present case. We are not persuaded.

The respondents' argument relies on a fusion of United States Supreme Court cases that have defined compulsion in the fifth amendment context, with cases that have discussed termination of parental rights. In the fifth amendment context, the respondents rely primarily on *McKune* v. *Lile*, 536 U.S. 24, 44, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002), which held that, even in noncriminal proceedings, courts must look to the severity of the potential consequences that may follow from a party's refusal to testify in determining whether there has been compulsion to testify in the fifth amendment sense. Building upon that notion, the respondents rely on *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 119–21, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996), which, in their view, "equated the loss of parental rights with the loss of

liberty that results from a criminal conviction." Thus, the respondents contend, a synthesis of *McKune* and *M.L.B.* reveals that termination of parental rights must be viewed as a consequence severe enough to constitute compulsion within the meaning of Practice Book § 34-1 (f). A discussion of the cases upon which the respondents rely is necessary to resolve this contention.

The United States Supreme Court repeatedly has stated, and we have agreed, that termination of parental rights implicates a parent's fundamental interest, which "undeniably warrants deference and, absent a powerful countervailing interest, protection." (Internal quotation marks omitted.) *M.L.B.* v. *S.L.J.*, supra, 519 U.S. 118; *In re Baby Girl B.*, supra, 224 Conn. 279. Termination of parental rights decrees, moreover, "[w]ork a unique kind of deprivation," and "are among the most severe forms of state action . . . ." (Citations omitted; internal quotation marks omitted.) *M.L.B.* v. *S.L.J.*, supra, 127–28. In *M.L.B.*, the court held unconstitutional a Mississippi statutory scheme that conditioned a party's right to appeal from any civil judgment, including those terminating parental rights, on the prepayment of costly record preparation fees. Id., 123–24. The petitioner in *M.L.B.* sought to appeal from a judgment terminating her parental rights, but was unable to pay the required fee, and was denied the ability to proceed in forma pauperis. Id., 109. Relying on equal protection and due process grounds, the court held that, once a state provides a parent with the right to appeal from a termination decree, it cannot constitutionally cut off access to appellate review because of a parent's inability to pay for required filing costs. Id., 123–24. Before *M.L.B.*, such a rule existed only for indigents in criminal cases; *Griffin* v. *Illinois*, 351 U.S. 12, 18–19, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (rule that conditioned appeals from criminal convictions on procurement of trial transcript held unconstitutional); and "quasi-criminal" matters.

*Mayer* v. *Chicago*, 404 U.S. 189, 196–97, 92 S. Ct. 410, 30 L. Ed. 2d 372 (1971) (extending *Griffin* rule to nonfelony charges carrying only maximum fine of $500 with no exposure to incarceration).

Although the court in *M.L.B.* v. *S.L.J.*, supra, 519 U.S. 124, analogized termination decrees with criminal and " 'quasicriminal' " matters for purposes of access to appellate rights, it did not label termination matters as "quasi-criminal" or noncivil; rather, the court, as it had done consistently in the past, reaffirmed that termination decrees belong in a special category "apart from mine run civil actions . . . ." Id., 127. Indeed, termination decrees already required a heightened "clear and convincing" standard of proof; *Santosky* v. *Kramer*, 455 U.S. 745, 769–70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); and the court previously had recognized that counsel, although not required in every case, may be required in some instances. *M.L.B.* v. *S.L.J.*, supra, 117; see *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 31–33, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981) (due process requires, in certain circumstances, that counsel be appointed to parents in termination proceedings). The court noted, moreover, that it would be "anomalous" to recognize the right to a free transcript in an appeal from a misdemeanor conviction under *Mayer*, where counsel is not constitutionally required, but deny the same right in termination appeals, even though, under *Lassiter*, counsel may be required if the situation warrants it. *M.L.B.* v. *S.L.J.*, supra, 123. Thus, *M.L.B.* reaffirmed the special status that was *already* given to termination proceedings, and simply added termination decrees to "the category of cases in which the State may not bolt the door to equal justice . . . ." (Citations omitted; internal quotation marks omitted.) Id., 124. It did not, as the respondents suggest, mandate that termination decrees be viewed as criminal or quasi-criminal matters for all purposes.

With regard to the concept of compulsion under the fifth amendment, *McKune* involved a Kansas rehabilitation program for convicted sex offenders, which required that participating inmates sign an "Admission of Responsibility" form, and also disclose any uncharged sexual offenses.[43] *McKune* v. *Lile,* supra, 536 U.S. 29–30. Refusal to participate in the treatment program, however, resulted in a reduced "privilege status," which meant that nonparticipating inmates were transferred to a maximum security unit with less desirable living conditions. Id., 30–31. Kansas, moreover, did not offer inmates immunity for waiving their privilege against self-incrimination. Id., 34. Thus, sex offenders under this scheme were faced with a choice of whether to acknowledge guilt and risk another criminal conviction, or to remain silent and subject themselves to inferior prison conditions usually reserved for more dangerous offenders.

The court held that Kansas' scheme did not violate the fifth amendment's privilege against self-incrimination because, "[a]lthough a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." (Internal quotation marks omitted.) Id., 41. The court concluded that, in light of the state's important interest in administering its prison system, the consequence at issue in *McKune,* namely, a reduced privilege status for the respondent, was not severe enough to "amount to unconstitutional compulsion." Id., 43; see, e.g., *Ohio Adult Parole Authority* v. *Woodard,* 523 U.S. 272, 286–88, 118 S. Ct. 1244, 140 L. Ed. 2d 387 (1998) (death row

---

[43] Thus, besides exposing oneself to additional uncharged crimes, if an inmate had testified and denied his guilt at trial, as the respondent had in *McKune,* an admission of guilt upon entering the rehabilitation program would subject the inmate to a possible charge of perjury. *McKune* v. *Lile,* supra, 536 U.S. 30–31.

inmate not "compelled" to speak at voluntary clemency interview, although adverse inference likely to be drawn from his silence); *Minnesota* v. *Murphy*, 465 U.S. 420, 440, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (probationer not "compelled" to speak, although silence could lead fact finder to infer that he violated terms of probation); *Baxter* v. *Palmigiano*, supra, 425 U.S. 319–20 (prisoner, facing thirty days in punitive segregation and downgrade of prisoner status, not "compelled" to speak at disciplinary proceeding, although silence could be used as evidence against him). The court, nevertheless, opined that, "one cannot answer the question whether [a] person has been compelled to incriminate himself without *first* considering the severity of the consequences." (Emphasis added.) *McKune* v. *Lile*, supra, 536 U.S. 44. Thus, although *McKune* may have limited the fifth amendment's application in the prison context, it made clear that other situations, with consequences varying in degree and circumstance, might warrant fifth amendment protection in noncriminal proceedings.

As noted in *McKune*'s concurring and dissenting opinions, moreover, there have been several instances in which the court has held that certain penalties, even those outside the criminal context, are severe enough to constitute compulsion to speak. See, e.g., *Lefkowitz* v. *Cunningham*, 431 U.S. 801, 806, 97 S. Ct. 2132, 53 L. Ed. 2d 1 (1977) (scheme under which elected official who chose to remain silent at grand jury proceedings was automatically removed from office violated privilege against self-incrimination); *Lefkowitz* v. *Turley*, 414 U.S. 70, 82–83, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973) (scheme under which contractor who remained silent at grand jury proceeding was disqualified from transacting with state violated privilege against self-incrimination); *Uniformed Sanitation Men Assn., Inc.* v. *Commissioner of Sanitation*, 392 U.S. 280, 284–85, 88 S. Ct. 1917, 20 L. Ed. 2d 1089 (1968) (scheme under which

state worker's refusal to sign waivers of immunity automatically resulted in termination of employment violated privilege against self-incrimination); *Gardner* v. *Broderick*, 392 U.S. 273, 279, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968) (same); *Spevack* v. *Klein*, 385 U.S. 511, 514, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967) (scheme under which attorney was disbarred for remaining silent violated privilege against self-incrimination); *Garrity* v. *New Jersey*, 385 U.S. 493, 497–98, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967) (police officers' statements were "compelled" and, therefore, inadmissible against them because officers would have been terminated had they remained silent). These cases, also known as the " 'penalty cases' "; *McKune* v. *Lile*, supra, 536 U.S. 50 (O'Connor, J., concurring); stand for the proposition that certain significant losses, even those financially oriented and noncriminal in nature, may nonetheless be severe enough to "compel" one to speak within the meaning of the fifth amendment. Put another way, these cases stand for the proposition that certain severe penalties may not be imposed as the cost of asserting one's constitutional fifth amendment privilege to remain silent.

Termination of parental rights decrees, however, do not fit neatly into either category of cases discussed in *McKune*. To be sure, the cases relied upon by the majority in *McKune* each involved additional punishments against petitioners who already had been convicted of a crime. The so-called "penalty cases," moreover, which found unconstitutional compulsion, are not dispositive because, although "[f]ew consequences of judicial action are so grave as the severance of natural family ties"; *Santosky* v. *Kramer*, supra, 455 U.S. 787 (Rehnquist, J., dissenting); termination of parental rights proceedings are not designed to *punish* parents,

but to *protect* children. See General Statutes § 17a-101;[44] *In re Juvenile Appeal (85–BC)*, 195 Conn. 344, 352, 488 A.2d 790 (1985); *In re Shane P.*, 58 Conn. App. 244, 258–59, 754 A.2d 169 (2000). Nonetheless, it goes without saying that the "penalty" that necessarily comes with a termination decree is arguably as severe as the penalties at issue in the "penalty cases," for instance, the loss of one's employment.[45]

The interest in remaining the parent of one's children, moreover, is presumably as fundamental as the financial interest one has in his or her employment. Under the Supreme Court's precedent, therefore, the respondents arguably might have had a right to be free from adverse inferences had they asserted their right not to testify *under the fifth amendment*. They, however, did not do so. See, e.g., *Minnesota v. Murphy*, supra, 465 U.S. 427 (fifth amendment privilege against self-incrimination must be affirmatively asserted); *State v. Huey*, 199 Conn. 121, 129, 505 A.2d 1242 (1986) (same).

The respondents' claim, therefore, does not appropriately rest on the fifth amendment; instead, it rests on a rule of practice derived from our state's already prophylactic body of juvenile law. For instance, although it is not constitutionally required that counsel be appointed to indigent parents in termination proceed-

---

[44] General Statutes § 17a-101 (a) provides in relevant part: "The public policy of this state is: To protect children whose health and welfare may be adversely affected though injury and neglect . . . ."

[45] That does not necessarily mean, however, that suffering an adverse inference in a termination proceeding is also unconstitutional under the penalty cases, because those cases involved an automatic, direct penalty resulting from the assertion of the constitutional privilege against self-incrimination; whereas in the present case, the penalty of an adverse inference merely added to the weighing process. Put another way, the adverse inference in the present case was one of many factors considered by the trier of fact; in the penalty cases, however, the assertion of the fifth amendment privilege was the only factor that led directly to the penalty. See, e.g., *McKune v. Lile*, supra, 536 U.S. 43–44; *Baxter v. Palmigiano*, supra, 425 U.S. 316–17.

ings; *Lassiter* v. *Dept. of Social Services*, supra, 452 U.S. 32; our law requires it. See General Statutes §§ 45a-717 (b),[46] 46b-135 (b)[47] and 46b-137 (b). By the same token, although termination proceedings repeatedly have been labeled civil in nature;[48] General Statutes § 46b-121; Practice Book § 32a-2; *In re Baby Girl B.*, supra, 224 Conn. 282; and ordinarily an adverse party may be called as a witness in any civil proceeding, our law provides parents with the right not to testify. We cannot conclude, however, that a parent's right not to testify, which exists only by virtue of a rule or statute, and is not constitutionally required, would, simply because of that enactment, also carry with it a protection that is generally reserved for the fifth amendment. The fact remains that the respondents in the present case asserted a nonconstitutional privilege, in a proceeding that is "essentially civil," and is neither criminal nor quasicriminal.

[46] General Statutes § 45a-717 (b) provides in relevant part: "If a party appears without counsel, the court shall inform such party of the party's right to counsel and upon request, if he or she is unable to pay for counsel, shall appoint counsel to represent such party. No party may waive counsel unless the court has first explained the nature and meaning of a petition for the termination of parental rights. . . ."

[47] General Statutes § 46b-135 (b) provides: "At the commencement of any proceeding on behalf of a neglected, uncared-for or dependent child or youth, the parent or parents or guardian of the child or youth shall have the right to counsel, and shall be so informed by the judge, and that if they are unable to afford counsel, counsel will be provided for them, and such counsel and such parent or guardian of the child or youth shall have the rights of confrontation and cross-examination."

[48] Practice Book, 2001, § 34-2 (a), now § 32a-2 (a), which immediately followed Practice Book, 2001, § 34-1 (f), provided that "[a]ll [termination of parental rights] hearings are *essentially civil proceedings except where otherwise provided by statute*. Testimony may be given in narrative form and the proceedings shall at all times be as informal as the requirements of due process and fairness permit." (Emphasis added.) Thus, even the Practice Book, the very authority on which the respondents rely, explicitly has labeled termination of parental rights cases "essentially civil" in nature. See also C. Tait, supra, § 1.15.1, pp. 46–47. The respondents, moreover, have not cited to, nor have we been able to trace, a single statutory exception to this general rule.

Outside of the use of the word "compelled" in Practice Book, 2001, § 34-1 (f), which also is used in the fifth amendment, the respondents have not presented any arguments that lead us to believe that the rule also contemplated an implicit prohibition against adverse inferences. Put another way, considering the legislative history surrounding the relevant statutes regarding juvenile matters, the rule's use of the word "compelled" does not, by itself, lead us to conclude that § 34-1 (f) was designed to prohibit adverse inferences in termination proceedings. Accordingly, despite the rule's structural similarity to the privilege against self-incrimination, we see no persuasive reason to depart from the general rule that adverse inferences are ordinarily permissible in noncriminal proceedings such as those in the present case.

Finally, the respondents argue that Practice Book § 34-1 (f) was meaningless if it allowed an adverse inference to be drawn against a parent at a termination proceeding. We disagree. Although the rule would have provided a parent with greater protections if it also barred adverse inferences, the rule nonetheless provided a parent with a privilege that is ordinarily not available in civil proceedings, namely, the right not to be called as a witness. This rule forced the petitioner to prove the allegations in the petition in ways other than through the parent's testimony. There is no doubt that a parent, faced with the choice of testifying or suffering an adverse inference, may feel compelled to testify in some sense of the word; but he or she still has a choice, albeit a difficult one, whether to testify in rebuttal to the allegations made by the petitioner, or to remain silent and require the petitioner to prove the allegation by clear and convincing evidence.

As we previously have noted, an adverse inference cannot supply proof of a material fact; it merely allows the fact finder to weigh facts already in evidence.

Although it is true that the respondents faced a difficult choice in the present case, namely, choosing whether to expose themselves to cross-examination or risking that an adverse inference might tip the scales in the petitioner's favor, that choice was preferable to no choice at all.

IV

PRIOR NOTICE OF ADVERSE INFERENCE

We now turn to the respondents' final claim, namely, that, even if an adverse inference may permissibly have been drawn against them in the present case, the trial court was required to have given prior notice of its intent to do so. We agree, and conclude that the language of Practice Book, 2001, § 34-1 (a), which stated that the judicial authority must "advise and explain" to the parents their right to silence at the commencement of any proceeding, coupled with the trial court's repeated affirmation of that right throughout the various proceedings underlying this appeal, would have led a reasonable person to believe that such a right was, in fact, unqualified. Consequently, the respondents were entitled to be notified by the court of the prospect that an adverse inference might be drawn from their silence. Put another way, if a trial court is inclined to draw an adverse inference against a parent for his or her failure to testify in a termination proceeding, it is incumbent upon the court to advise the parent accordingly.

We begin with the language of Practice Book, 2001, § 34-1 (a), which provided: "The judicial authority shall *advise and explain* to the parents, child or youth their right to silence and to counsel prior to commencement of any proceeding." (Emphasis added.) In this context, "advise" means "to . . . counsel . . . caution, [or] warn," as in to "advise of the consequences," and "explain" means "to make plain or understandable," as in to make "intelligible what is not immediately obvious

or entirely known . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). Thus, § 34-1 (a) strongly suggests that is it incumbent upon the trial court, not only to state expressly that parents have a right to silence, but also to explain, to some extent, the parameters of that right. The question then becomes precisely how much explanation was required in the present case.

In part III D of this opinion, we concluded that a parent's right to silence, as it was discussed in chapter 34 of the Practice Book, was derived from § 46b-137 (b), which provides that a parent's statement is not admissible "unless such person shall have been advised of his . . . right to refuse to make any statement and that any statements he makes may be introduced in evidence against him." We stated, moreover, that § 46b-137 (b) applied *Miranda*'s exclusionary rule to juvenile proceedings. See part III D of this opinion; C. Tait, supra, § 1.15.2 (b), pp. 49–50. In this regard, parents in termination of parental rights proceedings are given similar procedural protections as are criminal defendants; both groups must be warned of their right to silence as a matter of course. For this reason, we find *Doyle* v. *Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (impeachment of defendant's testimony through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process), to be an apt starting point.

In *Doyle*, the prosecution attempted to impeach the defendants' exculpatory testimony at trial, asking why the defendants had not given such an explanation to the police immediately after they were arrested. Id., 613–14. The United States Supreme Court held that the use of a defendant's postarrest silence for impeachment purposes violates due process because, after advising a defendant that he has a right to remain silent and to appointed counsel, "[s]ilence in the wake of these

warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." Id., 617. The court based its holding on two considerations. First, it noted that silence in the wake of *Miranda* warnings is "insolubly ambiguous" and consequently of little probative value; id.; second, and especially relevant here, it observed that, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id., 618; see also *Wainwright* v. *Greenfield*, 474 U.S. 284, 291–92, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) ("*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized." [Internal quotation marks omitted.]); see also *State* v. *Plourde*, 208 Conn. 455, 467, 545 A.2d 1071 (1988) (custody not prerequisite to *Doyle* violation where *Miranda* warnings have been given), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). The United States Supreme Court, therefore, interpreted the *Miranda* warnings so as to caution a criminal defendant, expressly, that anything said could be used against him, but implicitly that, should he remain silent, his silence would not be used against him.

The present case implicates much of the same concerns highlighted in *Doyle*. First, the respondents were given notice of their right to silence at least seven times throughout the various proceedings underlying this appeal. They never were advised by the trial court, however, that such a right was qualified in any way. For instance, at the plea hearing that preceded the termination proceeding, the trial court stated: "[Y]ou have a right to silence. It is your right not to talk about the situation, even if it won't get you into any trouble." Such an advisement, like the *Miranda* warnings, implied that silence would carry no penalty.

In addition, just as in *Doyle*, the respondents' failure to testify was not necessarily reflective of their inability to rebut the petitioner's allegations regarding their tumultuous relationship; rather, it simply may have represented their assertion of the privilege. Such an interpretation is especially plausible in the present case. Indeed, after the petitioner had presented all but one of the department's witnesses, the trial court expressed doubt as to whether the petitioner had presented evidence that would tend to show a failure to achieve rehabilitation. See footnote 9 of this opinion. Furthermore, the petitioner's final witness, Meier, did not add any firsthand knowledge as to whether the respondents were continuing their tumultuous relationship; rather, his testimony involved mainly hypothetical situations and was based on reports prepared by others.[49] Consid-

---

[49] For instance, Meier testified: "If the treatment goal is a stable family for this child, I would say there's been a failure to rehabilitate because I don't think that's occurred. If rehabilitation is defined as no further physical violence, then I would have to say rehabilitation has occurred. From a psychological standpoint, I can't give a yes or no answer to that unfortunately. I wish I could. But my concern is if there's evidence—and I don't have all the recent evidence. I didn't see the conflict myself. I'm referring mostly to documents." Meier further stated: "As the hypothetical indicated, if that's true that people are hiding in closets because they are afraid or if they're running out of the house or leaving because they're afraid, yeah. I think that's dysfunctional enough that it would have a negative impact on the child. . . . So it leads me to question whether, in fact, there is this type

ering that Meier's testimony did not substantiate the petitioner's allegations regarding the respondents tumultuous relationship, it is not implausible to conclude that the respondents may have elected to remain silent, not because they were unable to rebut the petitioner's allegations, but because they did not think that the petitioner had proven the allegations by clear and convincing evidence. Thus, just as the defendants' silence was "insolubly ambiguous" in *Doyle* v. *Ohio*, supra, 426 U.S. 617, so too was the respondents' election not to testify in the present case. Had the respondents been warned of the prospect that an adverse inference might be drawn, however, these concerns would evaporate because their election not to testify necessarily would have taken that consideration into account.

We are aware, as the petitioner suggests, that *Doyle* provides a less than perfect analogue for the present case because that case involved a defendant's *postarrest silence*, rather than an election not to testify at trial. In this regard, the respondents' silence did not occur "in the wake" of being told that they could remain silent, as it had in *Doyle*. Id. To the contrary, the respondents elected not to testify upon consulting with counsel, and after the petitioner had rested the case. Nonetheless, although *Doyle* was concerned with post-*Miranda* yet pretrial silence, the fact remains that the respondents were repeatedly given the functional equivalent of the *Miranda* warnings. The only difference, therefore, between the present case and *Doyle* is temporal, that is, the point at which the silence was induced. That distinction, however, does not negate the implicit assurance that the warnings carried, nor does it render

---

of stability in the home or whether, in fact, the intensity of these, the violence and the conflict is at the point where it would be harmful to the child. Unfortunately, I'm not there. So I don't know that and I can just base that on the suggestions from what other people have observed. . . . Well, the instability. It's not clear and this is what I don't know because I didn't observe it."

the reasoning of *Doyle* any less applicable to the present case.

In addition we are mindful that, unlike in *Doyle, the petitioner* in the present case neither induced silence, nor attempted to use that silence at trial; rather, the trial court drew the inference on its own accord. Indeed, the Supreme Court has "consistently explained *Doyle* as a case where *the government* had induced silence by implicitly assuring the defendant that his silence would not be used against him." (Emphasis added; internal quotation marks omitted.) *Portuondo* v. *Agard*, 529 U.S. 61, 74, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). Nonetheless, irrespective of whether the admonition comes from a court or through law enforcement personnel, the impact to the respondents remained the same; they were told several times of their right to silence, which carried an implicit assurance that silence would carry no penalty. See, e.g., *Leecan* v. *Lopes*, 893 F.2d 1434, 1440 (2d Cir. 1990) ("[t]he admonition [the petitioner] concededly received from the judge at arraignment in open court, addressing a group of arrestees, is not materially distinguishable for *Doyle* purposes from a warning delivered by police prior to a custodial interrogation"). In this regard, there is no reason to believe that an admonition provided by a court is less reliable than warnings administered by law enforcement personnel. Finally, not only were the respondents given notice of their right to silence *by the court* several times, Practice Book, 2001, § 34-1 (f) expressly stated they may not be compelled to testify. The language contained in our rules of practice, coupled with the trial court's unconditional admonitions, would have led a reasonable person to assume that the right to silence would carry no penalty.

We also note that our conclusion that the trial court was required to have given the respondents prior notice of its intent to draw an adverse inference is not based

on due process grounds,[50] as was the Supreme Court's holding in *Doyle* v. *Ohio*, supra, 426 U.S. 618; rather, our conclusion represents what we perceive to be the most plausible reading of the procedures required in order to administer effectively chapter 34 of the Practice Book. As previously discussed in part III F of this opinion, our statutes pertaining to juvenile matters

---

[50] We note further that the respondents' claim that due process precludes an adverse inference is unavailing. The respondents' due process argument pales in comparison with those cases in which we have interpreted the principle of fair warning. See, e.g., *State* v. *Vickers*, 260 Conn. 219, 231, 796 A.2d 502 (2002) (defendant had fair warning that conduct was proscribed because our construction of General Statutes § 29-35 [a] was neither unexpected nor indefensible); *State* v. *Miranda*, 260 Conn. 93, 106, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (defendant had fair warning because criminal liability under General Statutes § 53a-59 [a] [3] was neither unexpected nor indefensible by reference to existing common law).

"When determining what procedures are constitutionally required, we must bear in mind that [t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and [an] opportunity to meet it. . . . So long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens on the state under the guise of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, 235 Conn. 487, 493, 668 A.2d 360 (1995). In a situation analogous to the present case, in which a criminal defendant challenged his conviction on due process grounds because he did not receive fair warning that his conduct was unlawful, the United States Supreme Court has stated that the principle of fair warning is violated only where a result "is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (Internal quotation marks omitted.) *Rogers* v. *Tennessee*, 532 U.S. 451, 462, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001); *State* v. *Miranda*, supra, 260 Conn. 106. In addition, we stated in *State* v. *Miranda*, supra, 105, that a "statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions." (Internal quotation marks omitted.) As previously discussed in part III A of this opinion, the general rule is that the trier of fact may draw an adverse inference against a party in a noncriminal proceeding. Although the drawing of an adverse inference in a termination proceeding may have been unusual in a statistical sense, such an infrequency does not mean that the proceeding was so unfair as to amount to a violation of due process. Indeed, were we to hold otherwise, anytime the meaning of a rule is unclear, as it sometimes is, and a party claims to have been taken by surprise, a due process violation would occur.

already provide parents with greater protections than are constitutionally required. Bearing in mind that these rules of practice are designed to implement the statutes from which they were derived, chapter 34 of the Practice Book merely helped to delineate, as a matter of procedure, our prophylactic body of juvenile law. As previously discussed in part III A of this opinion, the trier of fact ordinarily may draw an adverse inference when a witness invokes a nonconstitutional privilege, and a party to a noncriminal proceeding ordinarily may be called as a witness; yet, although termination of parental rights proceedings are noncriminal in nature, parents in termination proceedings, like criminal defendants, cannot be called as witnesses. Compare General Statutes § 46b-137 (b) and Practice Book, 2001, § 34-1 (f) with General Statutes § 54-84 (a). This evinces an intent to provide parents with additional procedural safeguards in termination proceedings, although not quite to the same level as juveniles in delinquency proceedings. Moreover, an adverse inference cannot be drawn against a criminal defendant for an election not to testify; General Statutes § 54-84 (b); and, so far as we know, no trial court had, at the time of the proceedings underlying this appeal, expressly drawn an adverse inference against a parent in a termination proceeding. Thus, it was not unreasonable for the respondents to be taken aback by the trial court's decision to draw an adverse inference, nor can it be said that chapter 34 of the Practice Book clearly articulated to the parties the proper procedures to be employed in this area. Nevertheless, a central purpose behind chapter 34, especially Practice Book, 2001, § 34-1 (a), was to enable parents in termination proceedings to make informed choices in structuring their defense. With those principles in mind, we conclude that requiring the court to notify parents in the event that it may be inclined to draw an adverse inference is the most plausible procedural solution.

Moreover, we see no persuasive reasons against requiring a court, should it be inclined to draw an adverse inference, to notify a parent accordingly. First, because such notice will be required only if a court is inclined to draw such an inference, it will not unduly burden the court with excessive procedure. Second, considering that parental rights are "far more precious than any property right"; *Santosky* v. *Kramer*, supra, 455 U.S. 758–59; an additional layer of prophylaxis is not inappropriate.

Nonetheless, the petitioner argues that requiring notice in the present case is unnecessary because, even in criminal cases, a court has no duty to canvass a criminal defendant, beyond what the rules of practice require, regarding an election not to testify; rather, "the if and when of whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney." (Internal quotation marks omitted.) *State* v. *Joyner*, 225 Conn. 450, 482, 625 A.2d 791 (1993). This argument is without merit. Although choosing whether to testify is properly regarded as trial strategy, that is not the reason why notice of an adverse inference is not required in criminal proceedings. Criminal defendants are not warned about adverse inferences because the trier of fact may not draw such inferences. General Statutes § 54-84 (b); *Carter* v. *Kentucky*, supra, 450 U.S. 305. It suffices to say that notice is not required for a possibility that cannot occur.

Finally, the petitioner claims that, even if an adverse inference had been improperly drawn in the present case, any impropriety was harmless. Specifically, the petitioner contends that the inference drawn by the trial court was merely cumulative of the evidence that the petitioner already had presented and, therefore, did not influence the court's ultimate decision. We are not persuaded.

Although the trial court stated in its memorandum of decision that it found certain facts by clear and convincing evidence *before* it stated that it was drawing an adverse inference, the fact remains that the court's judgment rested, at least in part, on the adverse inference. We cannot say, with any certainty, whether the trial court would have ruled the way that it did in the absence of such an inference, nor can we conclude that it would have found the same facts by clear and convincing evidence. Indeed, the trial court concluded its analysis by stating: "Weighing the evidence in light of the failure of the respondents to testify to the contrary, the court finds by clear and convincing evidence that the respondents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Samantha's age and her needs, that they could assume a responsible position in her life." Lastly, the trial court devoted thirteen pages of its memorandum of decision to a discussion regarding the propriety of an adverse inference. It is unrealistic to assume that the court would have gone to such effort if it would have reached the same conclusion without the adverse inference.

The judgment is reversed and the case is remanded to the trial court for a new termination proceeding.

In this opinion the other justices concurred.